Will Lemkul, NV Bar No. 6715
Christian Barton, NV Bar. No. 14824
MORRIS, SULLIVAN, LEMKUL & TURTZO, LLP
3960 Howard Hughes Parkway, Suite 400
Las Vegas, NV 89169
Phone (702) 405-8100
Fax (702) 405-8101
lemkul@mslt.law
barton@mslt.law

*Attorneys for Plaintiff*
*REBEL OIL COMPANY, INC.*

## UNITED STATES BANKRUPTCY COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| In re | Case No.: 25-15215-MKN |
| MI SHEN GOLDBERG, | Chapter 13 |
| Debtor. | |

## **REBEL OIL COMPANY, INC.'S REPLY IN SUPPORT OF ITS OBJECTION TO CHAPTER 13 PLAN AND MOTION TO DISMISS CHAPTER 13 CASE**

To the Honorable MIKE K. NAKAGAWA, United States Bankruptcy Judge:

Creditor Rebel Oil Company, Inc. ("Rebel Oil" or "ROC"), by and through its counsel Will Lemkul and Christian W. Barton of the law firm of Morris, Sullivan, Lemkul & Turtzo LLP, hereby files the following Reply in Support of its Objection to Chapter 13 Plan and Motion to Dismiss Chapter 13 Case.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

**INTRODUCTION**

It is Debtor's burden to demonstrate her bankruptcy was filed in good faith. *In re Leavitt,* 209 B.R. 935, 940 (B.A.P. 9th Cir. 1997). Debtor's Opposition (Doc. 63) does nothing to prove she filed in good faith. To the contrary it confirms, rather than refutes that this case must be dismissed. This bankruptcy is a bad faith litigation tactic, not a legitimate reorganization. Instead of addressing the overwhelming evidentiary record of bad faith, statutory ineligibility, and plan infeasibility presented in Rebel Oil Company, Inc.'s ("ROC") Motion and Supplement (Docs. 56, 57), Debtor resorts to mischaracterizations, straw-man arguments, and legally irrelevant excuses.

Most telling, Debtor fails to dispute the central dispositive facts supporting dismissal: her admission that this bankruptcy was filed *solely* to stop Rebel Oil's fraud judgment; her continued concealment and undervaluation of assets after amendment; her plan's failure to meet the Best-Interests tests under Section 1325(a)(4); her failure to file mandatory § 1304 operating reports; her reliance on speculative plan funding that does not exist; and her ineligibility for Chapter 13 relief under § 109(e). The record further reflects a sustained course of pre- and post-petition misconduct designed to pressure, intimidate, and gain leverage over ROC through false accusations to regulatory bodies and materially false sworn statements.  Each of these grounds independently warrants dismissal; taken together, they require dismissal with prejudice.

Instead of confronting those issues, Debtor leans on distractions and excuses that find no support in the Bankruptcy Code. She argues that time extensions to file schedules cleansed her dishonesty; that (nonexistent) language barriers excuse serial omissions; that the Court must ignore liquidated, contractual interest to preserve her § 109(e) eligibility; and that ROC "deceptively" relied on furniture photos when ROC's Supplement focused on luxury appliances which Debtor swore were "basically all broken." None of Debtor's positions withstand scrutiny. The Ninth Circuit has repeatedly held that Chapter 13 is for the honest but unfortunate debtor, not one who games the system to evade a fraud judgment, conceals assets, and proposes an illusory plan. *Leavitt v. Soto (In re Leavitt)*, 171 F.3d 1219, 1224–26 (9th Cir. 1999) (dismissal with prejudice due to bad faith); *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 375–76 (2007) (denial appropriate where bad faith would abuse process). Applied here, those principles compel dismissal with prejudice.

**LEGAL ARGUMENT**

**I.    The issues which Debtor does not dispute (or even address) are dispositive.**

Before addressing Debtor's affirmative arguments, it is critical to note what Debtor does *not* dispute—because these omissions alone compel dismissal.

> **A.    Debtor's admission that she filed bankruptcy to stop Rebel Oil's lawsuit establishes debtors' bad faith.**

Debtor does not contest her Rule 2004 testimony that she filed this bankruptcy "*solely*" due to ROC's litigation. That concession is fatal. The Ninth Circuit has squarely held that filing bankruptcy for the sole purpose of defeating or delaying a specific creditor—particularly after adverse state-court rulings—constitutes bad faith warranting dismissal under § 1307(c). *Leavitt v. Soto (In re Leavitt)*, 171 F.3d 1219, 1224–26 (9th Cir. 1999); *In re Eisen*, 14 F.3d 469, 471 (9th Cir. 1994). In *Leavitt*, the Ninth Circuit affirmed dismissal with prejudice where the debtor filed for bankruptcy within two weeks of a state judgment, finding that the timing of the bankruptcy demonstrated that the primary purpose of the bankruptcy was to thwart a single adverse state-court action and not a legitimate repayment effort.

This case is squarely analogous. ROC obtained a minute order granting its motion for summary judgment on the basis Debtor's fraud. Debtor then filed the instant petition two days before the State Court *sua sponte* entered the final Judgment on September 5, 2025. Debtor claims to have essentially no secured debt and Debtor attributes virtually all her unsecured debt to ROC. But ROC had not yet attempted to collect on the judgment. Thus, as Debtor admitted, her bankruptcy was not filed due to debtors attempting to collect amounts owed. This bankruptcy was filed solely to prevent entry of final judgment and thwart ROC's state court litigation.

Debtor attempts to normalize her admission by asserting "debtors often file bankruptcy to stop lawsuits." That statement misstates the law. Filing bankruptcy because of litigation related financial distress is not the same as filing to defeat litigation. The timing of her filing and Debtor's lack of other meaningful debts prove that her filing was not due to mounting legal bills, but rather a tactical choice to defeat ROC's suit. The Ninth Circuit in *Leavitt* approved dismissal with prejudice and a refiling bar in materially similar circumstances. That remedy is warranted here.

3

**B.    *Debtor's initial falsehoods and her continuing falsehoods after amendment confirm manipulation, not mistake.***

Debtor's Opposition is silent on the central problem regarding Debtor's dishonesty: that her initial schedules contained numerous false representations, many of which persist even after she amended her schedules. All that Debtor states in her Opposition is that she "previously" addressed the false representations and that they do not provide a basis to dismiss her bankruptcy (Doc 63, 3:23-27.)  Neither assertion is accurate. Other than an alleged language barrier (discussed below), Debtor failed to provide any justification for her repeated false representations or explain why her amended schedules still contain misrepresentations. Equally critically, a debtor's truthfulness in their schedules is critical in the determination as to whether the bankruptcy was filed in bad faith. *In re Leavitt*, 171 F.3d at 1224.

As ROC noted in its Motion, Debtor's *initial* schedules <u>falsely</u> attested:

(1) she did not own any electronics, jewelry, sports equipment, or pets;
(2) she did not own and was not an officer of any business;
(3) all of her property was scheduled, even though she subsequently admitted her schedules only list her separate property and did not list the community property in which she holds an ownership interest in;
(4) her residence was transferred to her trust in 2020 even though the trust was not even created until the end of 2022;
(5) the Western Property and Apex Property—together worth millions of dollars— were owned by the trust even though in actuality she had transferred the properties to her business, Coronet Ceramics, Inc. ("Coronet");
(6) her business, Two Umphas LLC ("Two Umphas"), has no value despite it being a holding company for five luxury vehicles; and
(7) her debt to ROC was only for $275,000 and was incurred in 2024.

Debtor's Opposition fails to explain why her initial schedules contained so many material misrepresentations. More damning, her Opposition does not explain why after these misstatements were brought to Debtor's attention, she filed amended schedules that only cured a small portion of her misstatements. To this day, Debtor's amended schedules still omit electronics like the computer she used to attend her Rule 2004 exam and the cell phone her husband testified she possesses; they still assign a patently implausible $3,500 total value to all household goods and appliances in a multi-million-dollar custom home; they still do not list any of the community property in which she holds an ownership interest; they still list Coronet's value as "unknown" despite Coronet's filed

4

liquidation analysis showing $219,755.36 in net value; they fail to state a value for her counterclaim brought in Case No.A-24-898973-C entitled *Ying Zhu v. Mi Goldberg, et al;* and they still ascribe no value to Two Umphas LLC despite that entity holding five luxury vehicles. These are not scrivener's errors; they are compelling evidence of a concerted pattern of concealment and gross undervaluation designed to suppress liquidation value and minimize plan payments.

Courts in this Circuit treat such misstatements as evidence of bad faith. As the court explained in *Rolland*, bankruptcy schedules are signed under penalty of perjury, and debtors are responsible for their accuracy regardless of attorney involvement or later amendment. See *In re Rolland*, 317 B.R. 402, 414 (Bankr. C.D. Cal. 2004); see also *In re Thomas*, 2004 Bankr. LEXIS 2487, at *5-6 (Bankr. D. Idaho Jan. 21, 2004) (undervaluation and omissions evidencing unfair manipulation). Debtor's failure to rebut either her initial or her ongoing misstatements confirms that they were intentional and material. As in *Levitt*, *Rolland*, and *Thomas*, Debtor's repeated false statements in her schedules provide ample justification for the finding of bad faith.

### C.    The Best-Interests Test under Section 1325(a)(4) is not met.

Debtor did not and cannot address ROC's assertion that her proposed plan fails to satisfy the Best-Interests Test under § 1325(a)(4) of the Bankruptcy Code. Debtor's plan only provides a speculative $50,000 payment to unsecured creditors on month 44. Assuming arguendo that debtor's plan would actually distribute $50,000 to the unsecured creditors, even a conservative Chapter 7 liquidation would easily exceed this amount. Debtor's amended schedules now finally admit that she is the sole owner of Coronet. On January 5, 2026, Coronet filed a liquidation analysis in its own Chapter 11 bankruptcy in which Coronet asserted it had net liquidation proceeds of $219,755.36 *after paying off all its debts.* (**Exh. 69**.) A Chapter 7 trustee would require Debtor to divest herself of her valuable ownership interest in Coronet. A Chapter 7 trustee could also realize value through the estate's membership interest in Two Umphas—a holding company for five luxury vehicles. The trustee could also institute actions to recover property improperly transferred to Debtor's trust. ROC explained in its Motion that these amounts would *far* exceed the $50,000 which Debtor intends to provide to unsecured creditors in her proposed plan. Debtor does not address these issues in her Opposition and therefore Debtor admits that her plan is invalid. Certainly, she provides no credible

valuation contrary to this record and, more importantly, offers no present-value distribution remotely approaching a Chapter 7 outcome. Under § 1325(a)(4), confirmation is forbidden, and under § 1307(c), dismissal is appropriate where the plan cannot be confirmed.

**D.    Debtor does not dispute her failure to file § 1304 Business Operating Reports.**

Debtor's Opposition also wholly ignores her statutory obligation under 11 U.S.C. § 1304(c) to file monthly operating reports for the businesses she owns and controls. Although her initial schedules willfully omitted her ownership interests in multiple businesses, her amended schedules finally concede her ownership and control of Coronet, Two Umphas, Vegas Renewable Diesel ("VRD"), and M&Y Transportation LLC. But even to this day, Debtor has not filed operating reports for any of these businesses. Failure to file operating reports is classic "cause" for dismissal because it deprives the Court and creditors of transparency into ongoing business activity. *In re Ellsworth*, No. 2-07-BK-986-CGC, 2010 WL 11890079, at *2 (Bankr. D. Ariz. Mar. 24, 2010). While reported often in Chapter 11, the principle is identical under § 1307(c): a debtor who refuses baseline reporting cannot proceed. Debtor's silence on this issue is telling and independently supports dismissal of the bankruptcy.

**E.    Debtor does not dispute her plan relies on a nonexistent "Chapter 11 Payment" and defers unsecured creditor distributions for nearly four years.**

Debtor's red lined plan proposes 46 payments of only $500—with none of that amount being distributed to unsecured creditors. Instead, she proposes a single bulk distribution of $50,000 to unsecured creditors on plan month 44, which Debtor claims will be received via a "Chapter 11 Payment" from Coronet. ROC demonstrated in its Motion, that Coronet's Chapter 11 plan *does not propose any payments to Debtor*. Debtor's Opposition never addresses this issue because it cannot. Debtor does not actually intend to distribute $50,000 to her unsecured creditors.

It is well established that a plan premised on speculation rather than committed resources cannot be confirmed. Ninth Circuit authority consistently rejects Chapter 13 plans must meet the "feasibility" requirement and as a result, plans that rely on contingent or illusory funding cannot be confirmed. *In re Gavia,* 24 B.R. 573, 574 (B.A.P. 9th Cir. 1982). It was Debtor's burden to demonstrate the feasibility of her plan. *Id.* Debtor's plan mirrors the defect in *Gavia*: it offers the

semblance of a plan while functionally depriving unsecured creditors of value. ROC demonstrated in its Motion that Debtor's plan was entirely speculative and not feasible. Having wholly failed to address this issue in her Opposition, Debtor necessarily admits she cannot meet her burden to prove the feasibility of her plan. Dismissal is warranted.

### F.    Debtor does not dispute § 109(e) ineligibility once Rebel Oil's claim is counted

Finally, Debtor does not dispute that she is ineligible for Chapter 13 relief once the actual value of ROC's claim is counted. Debtor does not deny that if contractual interest and fees are counted, ROC's claim alone exceeds the $526,700 unsecured debt cap. Instead, Debtor's only rejoinder is that she "did not know" the interest and attorney's fees totals and as a result the amounts in her schedules should control. This argument fails for two reasons.

First, Debtor falsely asserts that she did not know that her debt to ROC included interest and attorneys' fees.  For the past several years ROC and Debtor have been involved in state court litigation regarding the amounts owed by Debtor to ROC. For the majority of the litigation, Debtor represented herself in pro per. Not only did ROC expressly seek interest and attorneys' fees in the litigation, the State Court also entered summary judgment against Debtor on September 8, 2025 and the order expressly stated "[i]nterest on the unpaid petroleum products obtained continues to accrue in the amount $4,119.80 per month. As of the date of this order, the current interest owed by Defendants totals $123,594." (**Exh. 54,** 9:26-28, 16:17-19.) The same order also stated that ROC was entitled to all "attorney's fees and all costs related to the litigation and/or Rebel Oil's collection of the debt." (*Id.,* 17:7-9.) Moreover, on October 1, 2024, Debtor filed bankruptcy on behalf of Coronet. ROC's proof of claim in that matter showed that even as of that date, ROC's attorneys' fees and costs to date was in excess of $69,000, and ROC sought their recovery. At the time Debtor finally provided her schedules in this bankruptcy and listed her debt to ROC, all of the foregoing was available to and known by Debtor. Thus, notwithstanding Debtor's false assertions to the contrary Debtor was plainly aware ROC's debt exceeded the statutory maximum.

Second, Debtor's alleged lack of "knowledge" of the debt is irrelevant. " A bankruptcy court should 'look past the schedules to other evidence submitted when a good faith objection to the debtor's eligibility has been brought by a party in interest.' " *In re Quintana*, 107 B.R. 234, 239

(B.A.P. 9th Cir. 1989)(quoting *In re Williams Land Co.*, 91 B.R. 923, 927 (Bankr.D.Or.1988); see also *In re Guastella*, 341 B.R. 908, 918–21 (9th Cir. BAP 2006). The Ninth Circuit BAP confirmed in *In re Fountain*, 612 B.R. 743 (9th Cir. BAP 2020), that the court is "justified" in relying on a creditor's proof of claim where the debtor's schedules are inaccurate.

Debtor's unsecured debts exceed § 109(e)'s cap once ROC's noncontingent, liquidated claim is properly calculated. The personal guaranty on which the debt is founded, includes 1.5% per month interest which is arithmetic and contractual; it accrued for two years pre-petition; and the guaranty provides for fees and costs. This Court may and should disregard Debtor's intentionally inaccurate statements and determine that the amount of unsecured debt owed by Debtor exceeds the cap. Dismissal on that basis alone is warranted.

## II.    Debtor's affirmative arguments misstate the record and the law and necessarily fail.

In addition to failing to address dispositive issues which require dismissal with prejudice of her bankruptcy, the arguments which Debtor does make misstate the record and law.

### A.    Timely extension to file schedules does not excuse the filing of false schedules.

Debtor's lead argument is that Rules 1007 and 9006 permitted her to delay filing schedules and the Court approved an extension; she then implies this cleanses her misstatements. Debtor's argument is flawed. Procedural compliance does not excuse substantive fraud. Debtor's schedules contained pervasive omissions and undervaluations, and the amendments left core falsehoods intact. If anything, the fact that Debtor was afforded *extra* time to prepare her initial schedules should have meant those schedules were *more* accurate. That Debtor was afforded a time extension to file her initial schedules and an opportunity to file amended schedules and yet her schedules are still replete with false statements proves that Debtor does not intend to treat fairly with her creditors.

### B.    Debtor's "limited English" claim is factually false and legally irrelevant.

In an attempt to excuse the pervasive inaccuracies in her schedules, Debtor asserts that English is  a second language and she "answered the best she could."  That claim collapses under the weight of the record. The totality of Debtor's conduct demonstrates not only functional English fluency, but substantial sophistication in contractual communications—a fact directly relevant to Debtor's intent, credibility, and whether she filed her bankruptcy in good faith.

The record reflects that Debtor is the owner and CEO of multiple Nevada corporations and limited liability companies, which necessarily involves ongoing written communication, contracts, and regulatory filings. (**Exh. 1**, p. 29:3-8; **Exh. 2**, p. 3; **Exh. 3**, p. 1-2; **Exh. 4**, p. 1-2.) In her capacity as the owner and CEO of Coronet she personally completed and successfully submitted multiple credit applications to Rebel Oil, including executing a personal guaranty. (**Exh. 12**; **Exh. 19**.) She completed all written submissions on behalf of Coronet required to bid for and obtain the Clark County requirements contract, a process involving multi-page forms, representations regarding capacity, pricing, and compliance, and communications with a government procurement entity. (**Exh. 15**; **Exh. 16**, **Exh. 17**.) She authored written complaints to the Nevada State Bar and Attorney General, and drafted correspondence falsely accusing ROC's counsel of misconduct. (**Exhs. 34-37**; **Exhs. 46-49.**) Throughout most of the pendency of the state court litigation between ROC and Debtor, Debtor represented herself *in pro per* and she personally filed multiple motions and prepared sworn declarations. (**Exh. 53**; **Exh. 56**.) These acts did not involve rote entries or checkbox forms; they involved nuanced written advocacy and factual assertions in English.

Further, this is not the first bankruptcy that Debtor has filed. On April 12, 2023, Debtor filed a Chapter 11 bankruptcy petition on behalf of Coronet (Case No. 23-11425-mkn), which she voluntarily dismissed on December 8, 2023. Debtor then filed a second Chapter 11 bankruptcy on behalf of Coronet on October 1, 2024 (Case No. 23-11425-mkn), which is currently ongoing. Debtor's Opposition artfully attempts to avoid this critical fact by asserting Debtor has "never filed a *personal* case before[.]" (Doc 63, 2:20-21 [emphasis added].) The simple truth is that Debtor has previously filed multiple bankruptcies without the glaring misrepresentations that pervade her schedules in the instant matter.

This record squarely defeats Debtor's attempt to portray herself as linguistically incapable of understanding bankruptcy schedules. In *In re Khalil*, the BAP held that courts may infer fraudulent intent where omissions and misstatements are systematic and self-serving, notwithstanding a debtor's claim of misunderstanding. 379 B.R. 163, 176–78 (9th Cir. BAP 2007). "[T]he number of misstatements or omissions, or the size or nature of a single one, might suffice to support a finding that a debtor knowingly and fraudulently made a false oath or account." *Id.*

Here, the pattern is unmistakable. Debtor's "mistakes" uniformly reduced her apparent assets, liquidation value, and income while inflating exemptions and minimizing repayment obligations. She omitted or undervalued electronics, household goods, business interests, counterclaims, and ownership structures; she mischaracterized ROC's fraud judgment; and she did so repeatedly, correcting only those misstatements that ROC exposed while leaving others intact. Such a pattern cannot plausibly be attributed to language difficulty, particularly given Debtor's proven prior business and bankruptcy sophistication.

### C.    Debtor misrepresents Rebel Oil's "appliance" evidence as pertaining instead to "furniture" and as a result, Debtor's declaration carefully avoids the issue.

Debtor accuses ROC of "intentional deception" by claiming ROC relied on old photographs of her residence to raise arguments regarding the value of her furniture. This is false and misrepresents ROC's argument. ROC's Supplement to its Motion cited public real estate listings and photographs of Debtor's residence for the limited purpose of demonstrating it contained built-in, high-end kitchen **appliances**—double refrigerators, double ovens, stainless steel built-ins—in those photographs. Debtor testified during her Rule 2004 hearing that all of the appliances in her residence were "basically all broken" and worth only "$100 or something." Debtor does not dispute that the listings are indeed photographs of her residence, instead she deflects and states that the photographs do not accurately depict her "furniture" and falsely accuses ROC of intentionally misleading this court. (Doc 63, 3:14-22.) But ROC never asserted that the furniture in the pictures was of the Debtor's furniture—ROC's argument solely pertained to built-in fixtures which transferred with the multi-million-dollar residence when Debtor purchased it. (Doc. 57, 2:14-3:2.)

Through this deception, Debtor carefully avoids addressing the appliances themselves, focusing instead on "furniture", and thereby avoids making further false statements about the current state and value of her appliances. The photographs are affirmative evidence that Debtor possesses valuable, high-end appliances which she has purposefully undervalued in her schedules. Debtor has provided no evidence that her high-end appliances were removed, destroyed, or sold. Debtor's accusation of deception therefore backfires: her declaration, which artfully avoids

assertions of the value of her appliances, confirms the adverse inferences which the Court should draw. Debtor possesses valuable appliances which she has withheld from her schedules.

Courts in this Circuit treat such gross undervaluation of obvious, high-value items as probative of bad faith. False valuation of Debtor's appliances independently supports bad faith. *In re Cortez*, 349 B.R. 608, 616 (Bankr. N.D. Cal. 2006). *Cortez* explains that when a debtor's schedules "omit or undervalue assets" in a way that distorts liquidation value, courts may find a lack of honesty under *Leavitt*. 349 B.R. 608, 616 (Bankr. N.D. Cal. 2006). Debtor's withholding of these valuable assets from her schedules further supports the finding of bad faith by Debtor.

### D. Bankruptcy filings by Debtor on behalf of her company and bankruptcy filings by her spouse are relevant as they show a clear pattern to thwart Rebel Oil's lawsuit.

Debtor insists that her husband's multiple filings and her companies' filings are irrelevant because this is her "first personal bankruptcy." The Ninth Circuit disagrees. The Ninth Circuit allows courts to consider the context in which a filing occurs, including coordinated or serial filings by insiders to frustrate a specific creditor. In *Craighead,* the bankruptcy court found

> there is sufficient evidence to consider the multiple bankruptcy filings by Debtor and Debtor's family … in determining the totality of the circumstances regarding Debtor's bad faith. Various courts in similar circumstances have considered the filings and acts of family members and other real property titleholders when determining bad faith of a debtor

*In re Craighead*, 377 B.R. 648, 655 (Bankr. N.D. Cal. 2007)(collecting cases).

This principle extends beyond spouses to include other family members and business associates who share property interests or coordinate their bankruptcy filings. The court's analysis in *Craighead* demonstrates how coordination among related parties can establish bad faith.

Here, Debtor cause Coronet to file for bankruptcy twice in lockstep with ROC's litigation milestones, and her husband, Timothy Wetzel, cycled through multiple filings as well; Debtor then filed personally after ROC obtained a minute order for its fraud summary-judgment ruling. Those facts make the *Leavitt* pattern—filings in service of obstruction—more pronounced, not less. Debtor's serial filings warrant dismissal with prejudice.

/ / /

/ / /

**E. Debtor's "irrevocable" trust argument Is factually and legally false as the record shows revocability and illusory transfers.**

Without any evidence and with scant argument, Debtor waves away the liquidation-value problem by asserting that "virtually all" she owns sits allegedly in an irrevocable trust. But Debtor's factually unsupported argument fails for several reasons.

First and foremost, Debtor does not dispute that she holds sole ownership of multiple companies, including Coronet and Two Umphas. To evade disclosing the value of Coronet, Debtor claims that its value is "Unknown." But as shown in ROC's Motion, Coronet filed a liquidation analysis in its own Chapter 11 bankruptcy on January 5, 2026, in which Coronet asserted it had net liquidation proceeds of $219,755.36 *after paying off all its debts*. (**Exh. 69**.) Debtor does not dispute this valuation in her Opposition, effectively admitting that Coronet has a value of over two hundred thousand dollars which Debtor. Similarly, Debtor admits in her amended schedules that she owns a 50% interest in Two Umphas and admits that it, not her trust, is the entity that actually holds the following luxury vehicles: a 2016 Mercedes_ Benz $10,000; 2021 Porsche 918 Boxster 18,000; 2016 Ford F350 10,000; 2017 Mercedes CLK63AMG 9,000; and a 1956 Ford Truck 50,000. Notwithstanding her false assertions, Debtor holds significant assets outside her trust.

Second, Debtor has provided no evidence whatsoever demonstrating that her trust is irrevocable even though ROC's Motion questioned the nature of her trust. The record reflects that Debtor admitted in her Rule 2004 exam that "trustees can amend or change the trust." (**Exh. 57**, p. 37:14-16.) This demonstrates that the trust is revocable. The record also reflects valuable real property was transferred into and out of Debtor's trust without any consideration being provided. (Doc. 56, pp. 10:21-11:11.) This further proves that Debtor's trust is not irrevocable.

Third, even if the trust is irrevocable it would not necessarily preclude a Chapter 7 trustee from recovering from the trust. In *Schwarzkopf*, the Ninth Circuit held that assets placed into an irrevocable trust subject to the debtor's continued control or benefit were recoverable by the estate, finding that the trust was the alter ego of the Debtor. *In re Schwarzkopf*, 626 F.3d 1032 (9th Cir. 2010). Likewise, in *Cutter*, the BAP recognized that where the debtor retains incidents of ownership or directs asset flows, a trustee may treat the trust as illusory and reach its assets. *In re*

*Cutter,* 398 B.R. 6, 19–22 (9th Cir. BAP 2008). The analogy is exact. Debtor's own testimony admits amendability; the deeds show whipsaw transfers; and there is no evidence of value-for-value exchange. A Chapter 7 trustee would have colorable and valuable claims to recover such assets, which means—at minimum—the best-interests test is not met.

**III.    Dismissal *with* prejudiced is warranted given the egregious facts of this case.**

Section 349(a) authorizes dismissal with prejudice for cause, and *Leavitt* holds that bad faith constitutes such cause. *Leavitt*, 171 F.3d at 1223–26. The factors here—filing solely to defeat an imminent fraud judgment, serial concealment and undervaluation, misuse of trusts, multiple bankruptcy filings by related individuals and entities, failure to meet mandatory reporting, and a plan premised on delay and speculation—demonstrate an ongoing willingness to manipulate the process. Without a dismissal and a brief one-year filing bar, there is every reason to expect further abusive filings when ROC attempts to enforce its fraud judgment. The Court should therefore dismiss with prejudice and bar refiling for one year to protect the integrity of the bankruptcy system and the rights of creditors.

**<u>CONCLUSION</u>**

It was Debtor's burden to demonstrate that her bankruptcy was filed in good faith. Debtor's Opposition misstates ROC's arguments, ignores the dispositive facts, and advances legal positions the Ninth Circuit has foreclosed. Far from proving good faith, indeed, it reinforces the conclusion that this Chapter 13 case was filed and prosecuted in bad faith. Debtor's pre- and post-petition conduct, including extortive regulatory complaints and a knowingly false sworn declaration during bankruptcy, independently establishes abuse of process. Her claim of limited English proficiency is contradicted by a record demonstrating extensive written sophistication and business acumen. Her schedules, plan, and eligibility all remain defective, and her silence on key issues speaks volumes. The Bankruptcy Code does not exist to shield litigants who weaponize it to evade accountability for fraud. Further, Debtor remains ineligible under § 109(e) and her plan fails §§ 1325(a)(4) and (b), providing additional independent grounds for dismissal. The Court should grant ROC's Objection and Motion to Dismiss, deny confirmation, dismiss this Chapter 13 case with prejudice, and impose on Debtor a one-year bar on refiling. In the alternative, at minimum, the Court should set an

evidentiary hearing focused on Debtor's false declarations, pre- and post-filing misconduct, and her continued nondisclosures of valuable assets.

Dated: March 23, 2026

MORRIS, SULLIVAN, LEMKUL & TURTZO, LLP

By:    */s/ Christian Barton*_____
          Will Lemkul, NV Bar No. 6715
          Christian Barton, NV Bar. No. 14824
          *Attorneys for Rebel Oil Company, Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on 23rd day of March, 2026, I served a copy of the above and foregoing, via ELECTRONIC SERVICE ECF System, where an email address is provided and by depositing the same in the United States Mail, first class, postage prepaid, addresses to those not electronically mailed.

/s/ Sophie Inglis
An employee of MORRIS, SULLIVAN, LEMKUL & TURTZO, LLP